UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

———————————————————— )
                                                        )
UNITED STATES OF AMERICA          )               1:21-CR-00088-PB
                                                        )
v.                                                    )
                                                        )
COREY DONOVAN                            )
                                                        )
———————————————————— )

## **DEFENDANT'S MOTION TO DISMISS II**

The Supreme Court's recent opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), marked a dramatic shift in Second Amendment law[1]. Mr. Donovan is aware of two other cases in this district where the defendant asked that this Court dismiss their indictments charging the crime of felon in possession of a firearm and ammunition under 18 U.S.S. § 922(g)(1) based on this shift in jurisprudence. Specifically, Mr. Donovan is aware that counsel in *U.S. v. Brandon Dumont* at 1:22-CR-53-PB-1, Doc. 34 and *U.S. v. Michael Roux* at 1:22-CR-19-SM-01, Doc. 32, have filed such motions. Mr. Donovan is also aware that this Court has denied at least one motion to dismiss on this claim. The defendant is aware that this Court will likely deny this motion but he files this motion as he is aware of litigation that could potentially result in a different finding in other courts in the future. This pleading draws heavily from the pleadings filed by Attorney Dorothy Graham, in U.*S. v. Brandon Dumont* at 22-CR-53-PB-1, Doc. 34 and the pleading filed by Attorney Kirsten

---

[1] This pleading draws heavily from that filed by Atty. Dorothy Graham, in 22-CR-53-PB-1

Wilson in *U.S. v. Michael Roux* at 1:22-CR-19-SM-01, Doc. 32.

Under the new framework mandated by *Bruen*, the Court should dismiss count one of the indictment which charge Mr. Donovan with being a prohibited person in possession of a firearm and ammunition under 18 U.S.C. § 922(g)(1). Because possession of a firearm comes within the Second Amendment's "plain text," Mr. Donovan's conduct is presumptively protected. And the government will be unable to rebut that presumption. Felon-disarmament laws, which did not appear in the United States until the 20th Century, were unknown to the generation that ratified the Second Amendment. Under the analysis set forth in *Bruen*, the indictment must be dismissed.

## I.   FACTS

Mr. Donovan is charged in a one count indictment with being a felon in possession of a firearm/ammunition in violation of 18 U.S.C. §922(g)(1). Mr. Donovan went to trial on the indictment and was found guilty by jury on October 15, 2021. A sentencing hearing is scheduled for November 28, 2022.

In the case before the Court, a search warrant was issued and executed for Mr. Donovan's home and vehicle in rural Wilmont, NH. The defendant's property consisted of several separate buildings, including a main home, a garage apartment and a large workshop. Doc. 80 ¶ 11. Mr. Donovan's mother and sister occupied the main home and Mr. Donovan and his girlfriend resided in the garage apartment. *Id.* An extension of the warrant was issued at 1:20 pm on March 26, 2021. Prior to the issuance of an extension to the warrant, law enforcement searched and located a Mossberg Model 500, 20-gauge shotgun strapped to the roll bar in the green Jeep Wrangler. Doc. 12 at 2.

## II.    LEGAL BACKGROUND

### A.    Before *Bruen*, lower courts assessed Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008). The Court canvassed "the historical background of the Second Amendment." Based on this survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. Two years after *Heller* the Court reaffirmed *Heller*'s "central holding": that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). The Court described the right to keep and bear arms as "deeply rooted in this Nation's history and tradition." *Id.* at 768. And that right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. *Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee." *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018). If the challenged law imposed no such burden, it was valid. *Id.* But if the statute did

burden Second Amendment conduct, courts then "determine[d] what level of scrutiny [was] appropriate and … proceed[ed] to decide whether the challenged law survive[d] that level of scrutiny" *Id.* Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in *Heller*—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. *Id.* at 670-671.[2]

### B.   *Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."

In *Bruen*, however, the Supreme Court squarely rejected such "judge-empowering" tests – instructing the courts firmly to respect the "balance... struck by the traditions of the American people" as embodied in the text and "unqualified command" of the Second Amendment. *Bruen*, 142 S. Ct. at 2130-31. *Bruen* rejected the lower courts' framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2127. The Court was emphatic that going forward, courts consider only "constitutional text and history," *Id.* at 2128-29 & n. 5, which are now the only relevant steps in the analysis. At the first step, *Bruen* clarified, if "the Second Amendment's plain text covers an individual's conduct," then "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, at the second step the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm

---

[2]The First Circuit explicitly adopted this framework in *Gould v. Morgan*. Prior to that time, as *Gould* noted, it "employed an analysis that resembled some part of the framework." *Id.* at 669 n. 4 (citing *United States v. Rene E.* 538 F.3d 8 (1st Cir. 2009) and *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011)).

regulation." *Id*. at 2129-30.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2126. This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32.   If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.*  at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136.[3] Courts may look to the tradition of firearms regulation "before  . . .  and even after the founding" period, but they should do so with care.  *Id.*  at 2131-32.  The Court cautioned, for example, that "[h]istorical evidence that long predates  [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or   legal   conventions changed in the intervening years." *Id.*  at 2136.  Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the  Constitution  and  never  was acted upon or accepted in the colonies." *Id.*

---

[3] The Court reserved the question whether courts entertaining challenges to state statutes should examine history as of 1868, when the Fourteenth Amendment was adopted. *Id.* at 2137-38.

Conversely, courts must "guard against giving post enactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century  represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to  keep  and  bear arms took place 75 years after the ratification of the Second Amendment,  they  do  not provide as much insight into its original  meaning  as  earlier  sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but should otherwise afford it little weight. *Id.*  After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.*  ("[T]o the extent later history contradicts what the text says, the text controls.").

As *Bruen* explained, the standard for reviewing the government's historical evidence differs depending on what kind of problem a statute is intended to remedy. In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be fairly straightforward." *Bruen*, 142 S. Ct. at 2131. The government can defend such statutes only by identifying  a tradition of "distinctly similar" regulations from the founding era. *Id*. In those types of cases

> ... the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern

regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131; *see also id.* (explaining that if "the Founders themselves could have adopted" a particular regulation "to confront" "a perceived societal problem," but did not do so, then that regulation is unconstitutional today).

In "other cases," where a statute addresses a problem that was "unimaginable at the founding," a less demanding standard applies. *Id.* at 2132. This standard "involve[s] reasoning by analogy"—asking whether a modern firearm regulation and a historical analogue are "relevantly similar" in terms of (1) whether they "impose a comparable burden on the right of armed self-defense," and (2) "whether that burden is comparably justified." *Id.* at 2132-33. But this form of historical inquiry is permissible only if the challenged statute is directed at "unprecedented   societal   concerns   or dramatic technological changes" that are "not . . . the same as those that preoccupied the Founders in 1791." *Id.* at 2132.

Whether based on "distinctly similar" precursors or merely historical analogues,  the "comparable tradition of regulation" must be robust. *See id.* (requiring "a well- established and representative" historical analogue); *id.* at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic"). A handful of "outlier[]" statutes  or cases  from  a  small  number of "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156.  The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would be sufficient  to  establish  a  relevant  tradition.   *Id.* at 2142.  And  in  evaluating  19th-Century

"surety laws" that New York argued were precursors to its "proper cause" requirement, the Court discounted two of those ten laws—which were closest to New York's—as unrepresentative. *See id.* at 2148 n.24. Moreover, even if certain statutes were widespread, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. *See id.* at 2149 (dismissing surety laws because "respondents offer little evidence that authorities ever enforced [those] laws").

Finally, *Bruen* emphasized—repeatedly—that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. The "[g]overnment bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127, 2130. Courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain

[a] statute. That is [the government's] burden." *Id.* at 2150; *see also id.* at 2149 n.25 ("[T]he burden rests with the government to establish the relevant tradition of regulation.").

## III.   18 U.S.C. § 922(g)(1) VIOLATES THE SECOND AMENDMENT

Section 922(g)(1) fails both steps of the *Bruen* analysis. First, the Second Amendment's plain text covers Mr. Donovan's conduct of possessing firearms and ammunition. Second, the government will not be able to carry its burden of establishing a historical tradition of felon-disarmament laws. *Bruen's* requirements are demanding: a firearm regulation is consistent with American tradition only if distinctly similar regulations were widespread and commonly accepted in the founding era when the Second Amendment was adopted. And they were not. For these reasons further detailed below, § 922(g)(1) is facially unconstitutional. The Court should dismiss counts three and four of the indictment

for failure to state an offense.

### A. BRUEN STEP ONE: THE SECOND AMENDMENT'S PLAIN TEXT COVERS MR. DONOVAN'S CONDUCT OF POSSESSING FIREARMS AND AMMUNITION.

At step one of the *Bruen* analysis, the Court asks whether "the Second Amendment's plain text covers the individual's conduct." *Bruen*, 142 S. Ct. at 2129-30. That text contains three elements, guaranteeing the right (1) "of the people, (2) "to keep and bear," (3) "arms." *Heller*, 554 U.S. at 579-85. As explained below, Mr. Donovan and his conduct fall squarely within each element.

#### 1. Mr. Donovan is among "The People" protected under the Second Amendment.

In *Heller* the Supreme Court explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 580-81.

Mr. Donovan is an American citizen and lifelong member of the national community. Thus, the Second Amendment's use of the phrase "the people" unambiguously refers to him. *Id.* at 579. Just as the Second Amendment does not "draw... a home/public distinction with respect to the right to keep and bear arms," *Bruen*, at 2134, it does not draw a distinction between felons and non-felons. *United States v. Jimenez-Shilon,* 34 F.4th 1042, 1046 (11th Cir. 2022) (describing felons as "indisputably part of 'the people'" under the Second Amendment); *see also United States v. Meza-Rodriguez*, 798 F.3d 664, 671 (7th Cir. 2015) (holding that a person's criminal record is irrelevant in determining whether the person is among "the people" protected under the Second Amendment; noting that the amendment "is not limited to such on-again, off-again protections"); *Folajtar v. Attorney Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) ("Felons are more than the wrongs they have

done.  They are people and  citizens who are part of 'We the People of the United States.'").

*See also Kanter v.  Barr*, 919 F.3d 437, 451–52 & 464  (7th Cir. 2019) (Barrett, J., dissenting) (explaining that a person's status – e.g. felon– is properly considered in the question of historical tradition, rather  than  the  existence of the right and that "[h]istory does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons.").[4]

### 2.      Keep and Bear Arms.

As the Court recognized in *Heller*, the word "keep" means "[t]o have in custody" or to "retain in one's power of possession." 554 U.S. at 582. And the word "bear" means "to 'carry.'" *Id*. at 584. Moreover, the Court held in *Bruen,* the meaning of "bear" even includes carrying in public outside the home. 142 S.  Ct.  at 2134-35 ("To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections.") Thus, the Court has made clear, the text of the Second Amendment protects the right to possess a firearm both inside  and outside the home.

Finally, the term "arms" refers to "[w]eapons of offense, or armour of defense." *Heller*, 554 U.S. at 581.  The Supreme Court has  construed  the  term  as  "extend[ing]  … to all instruments that constitute bearable arms,  even  those that  were not  in  existence  at the time of the founding." *Id*. at 582.  And it has specifically held the term protects the right to possess "handguns," *id*. at 629, which were in "common use" at the founding. *Id*. at 627. The indictment alleges that Mr. Donovan possessed a Mossberg shotgun as well as

---

[4] A contrary interpretation of "the people" would produce anomalous results. *Heller* explained that "the people" is a "term of art" that has a uniform meaning across a number of constitutional provisions, namely, the First, Second, Fourth, and Ninth Amendments. 554 U.S. at 579-80. If law- breaking excludes someone from "the people" for Second Amendment purposes, then it excludes him from "the people" for First and Fourth Amendment purposes as well. The result would be that even after serving all terms of his sentence (including probation or parole), a felon could be permanently deprived of his right to speak about matters of public concern, to worship according to his faith, or to be free from warrantless searches of his home.

ammunition. All would come within the definition of "arms."[5]

Because "the Second Amendment's plain text covers Mr. Donovan's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The "general societal problem" that § 922(g)(1) is designed to address—i.e., felons with access to guns—is one "that has persisted since the 18th century." *Id.* at 2131. As a result, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation[s]" as of 1791, when the Second Amendment was ratified. *Id.* The government will be unable to make that showing.

What is today § 922(g)(1) traces its origins to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm possession by those convicted of crimes such as murder, rape, kidnapping, and burglary, *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was not until 1961 that Congress amended the statute to prohibit "possession by *all* felons." *Skoien*, 614 F.3d at 640 (emphasis in original) (citing Pub. L. 87–342, 75 Stat. 757); *Booker*, 644 F.3d at 24. Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.* Thus § 922(g)(1) "is firmly

---

[5] *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018); ("ammunition is necessary for [] a gun to function are intended."); *Jackson v. City of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (noting that "without bullets, the right to bear arms would be meaningless" and holding that city ordinance prohibiting the sale of hollow-point ammunition regulates conduct within the scope of the Second Amendment).

rooted in the twentieth century," *Booker*, 644 F.3d at 24—a century and a half after adoption of the Second Amendment. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137. Indeed, in *Bruen* the Court said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since such evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

Even if the Court broadens its focus to consider state statutes as well, § 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007) (hereafter "Churchill"). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142. Carlton Larson, a professor at the University of California-Davis School of Law, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good

degree of confidence say that bans on convicts possessing firearms were unknown

before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv.

J. L. & Pub. Pol'y 695, 708 (2009). It appears New York became the first state to enact such a

ban, when in 1917 it made a felony conviction a basis for revoking a concealed- weapon

permit. *Id.* No other state passed a felon-disarmament law until 1923.  *Id.*; *see also* Adam

Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex- felons

possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half

after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist*

*Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support

for the claim that [felon-disarmament laws] are consistent with the preexisting right to

arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the*

*Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions

on the possession of firearms by convicted felons emerged  early  in the twentieth century

in response to a crime wave following the First World War."); *accord N.R.A.*, 700 F.3d at 197

("[A] strictly originalist argument for . . . bans on firearm possession by felons . . . is difficult

to  make.").

        In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly

similar" to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31.  The "Founders themselves could have

adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by

violent felons. *Id.* at 2131. But they declined to do so, and that inaction indicates § 922(g)(1)

"[i]s unconstitutional." *Id.*

The government cannot attempt to justify § 922(g)(1) by resorting to "analogical

reasoning." *Id.* at 2132.  According to *Bruen*, that mode of analysis is available only when    a

Second Amendment challenge "implicat[es] unprecedented societal concerns," "dramatic technological changes," or "modern regulations that were unimaginable at the founding." *Id.* But the potential danger posed by felons' access to firearms would have been neither unprecedented nor unimaginable to the Founders. As a result, the government cannot rebut the presumption of unconstitutionality by identifying a "historical analogue" to § 922(g)(1). *Id.* at 2133.

Even if analogical reasoning were appropriate in this case, however, it would not aid the government. Mr. Donovan is unaware of a historical tradition of founding-era statutes that are "relevantly similar" to § 922(g)(1). *Id.* at 2132. The government will therefore     be unable to shoulder its burden of rebutting the presumption of unconstitutionality.

1.   ***Heller*'s statements about "presumptively lawful regulatory measures" and "law-abiding, responsible citizens" do not control this case.**

Mr. Donovan expects the government will attempt to sidestep the straightforward *Bruen* analysis above by falling back on two passages from *Heller* that supposedly place felons outside the protection of the Second Amendment. In the government's view, these passages deem felon-disarmament laws "presumptively lawful" and limit Second Amendment rights to "law-abiding, responsible citizens." Neither passage justifies ignoring *Bruen*'s clear command. The first was dicta and, in any event, has been superseded by the new *Bruen* framework; the second establishes a constitutional baseline that protects, rather than limits, Second Amendment rights. These passages cannot save § 922(g)(1).

a.   **"Presumptively lawful regulatory measures"**

After completing its historical survey, and before assessing the constitutionality of the District of Columbia's statutes, the Court in *Heller* inserted some "precautionary

language." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc).

The Court wrote that the Second Amendment right "is not unlimited" and is "not a right to

keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose." *Heller*, 554 U.S. at 626. It then added the language that Mr. Donovan expects the

government to cite in this case:

> Although we do not undertake an exhaustive historical analysis today of the full scope
> of the Second Amendment, nothing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms by felons and the mentally
> ill, or laws forbidding the carrying of firearms in sensitive places such as schools and
> government buildings, or laws imposing conditions and qualifications on the
> commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court wrote, "We identify these

presumptively lawful regulatory measures only as examples; our list does not purport to

be exhaustive." *Id.* at 627 n.26.

In other cases, the government has argued this portion of *Heller* definitively

establishes that felon-disarmament laws are consistent with the Second Amendment. That

view is mistaken. The question of felon-disarmament laws' constitutionality was not

before the Court in *Heller*, and any statements in the opinion addressing that question are

therefore "dicta." *See Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J.,

dissenting on other grounds) (describing *Heller's* discussion of felon- disarmament laws

as "dicta").[6] The result is that, as the *en banc* Seventh Circuit has explained, the passage

cited above should not be treated as a holding:

> The language we have quoted warns readers not to treat *Heller* as containing broader
> holdings than the Court set out to establish: that the Second Amendment

---

[6]*See also, e.g., Tyler v. Hillsdale County Sheriff's Dept.,* 837 F.3d 678, 686-87 (6th Cir. 2016) (describing Heller's "presumptively lawful" language as "dictum"); *United States v. Scroggins,* 599 F.3d 433, 451 (5th Cir. 2010) (same); *United States v. Williams,* 616 F.3d 685, 692 (7th Cir. 2010) (same); *United States v. McCane,* 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (characterizing "presumptively lawful" language as "the opinion's deus ex machina dicta").

creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court's disposition. Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration.

*Skoien*, 614 F.3d at 640; *accord Tyler*, 837 F.3d at 687 (same). *See also Booker*, 644 F.3d at 23 (noting that the First Circuit finds itself in agreement with the Seventh Circuit's observation in *Skoien*, "of the relatively futility of 'parsing these passages of *Heller* as if they contain an answer to the question of whether [a statute] is valid.'").

Finally, even if the *Heller* dicta might once have warranted deference, it no longer does today. This particular dicta has been "enfeebled by later statements" in a subsequent Supreme Court case. *McCoy,* 950 F.2d at 19. It may be true that "nothing in [*Heller*] cast doubt on longstanding prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626, but *Bruen*'s new framework *does* cast doubt on such laws. As explained above, *Bruen* demands a "text-and-history" analysis that looks only to "the Second Amendment's plain text" and our "Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126, 2138. Neither of those sources provides any support for felon-disarmament laws. It is perhaps unsurprising, then, that the Court in *Bruen* did not repeat *Heller*'s dicta about "longstanding" and "presumptively lawful" felon- disarmament laws.

Rather than following outdated, historically unsupportable dicta from *Heller*, this Court should adhere to the binding framework supplied by *Bruen*. Elevating *Heller*'s dicta over *Bruen*'s holding would treat the Second Amendment right "as a second-class right," contrary to the Supreme Court's admonishment in *McDonald*. 561 U.S. at 780.

### b.    "Law-abiding, responsible citizens"

In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the

*Heller* majority explained that the Second Amendment "is the very *product* of an interest balancing by the people." 554 U.S. at 634-35 (emphasis in original). The result is that judges lack authority to "conduct [that balancing] anew" or "decide on a case- by-case basis whether the right is *really worth* insisting upon." *Id.* (emphasis in original). And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Based on this language, the government has argued elsewhere that only "law-abiding, responsible citizens" enjoy the right to keep and bear arms.

This argument plainly misreads *Heller.* The Court in *Heller* did not limit the Second Amendment right to law-abiding, responsible citizens. Rather, it said that, *at the very least*, such people are protected by the Second Amendment. By beginning the quoted passage with "whatever else it leaves to future evaluation," the Court made clear that its reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling. The Court, in other words, held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether— much less rule out the conclusion that— other people have that right, too.

*Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* dispelled the ambiguity. The passage cited above references law-abiding, responsible citizens' right to use arms "in defense of hearth and home." *Id.* If that passage were meant to demarcate the outer limits of the Second Amendment right, then even law- abiding, responsible citizens would have no right to use firearms *outside* the home. But *Bruen* held the Second Amendment right does extend outside the home, 142 S. Ct. at 2134, and the

Court in *Bruen* gave no hint that it believed it was contradicting what it said in *Heller*. Thus *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

*Heller* also used the word "law-abiding" during a discussion of the Court's opinion in *United States v. Miller*, 307 U.S. 174 (1939), which the District of Columbia cited to support its collective-rights view of the Second Amendment. The *Heller* Court wrote that it "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short- barreled shotguns." 554 U.S. at 625. This reference to "law-abiding" citizens, like the last, does not suggest, much less hold, that *only* the law-abiding enjoy Second Amendment rights. As the *Heller* Court emphasized, *Miller* addressed "the *type of weapon[s]*" that are "eligible for Second Amendment protection"—which *Heller* explicitly contrasted with the question of the *type of people* who are eligible for Second Amendment protection. *Id.* at 622 (emphasis in original) (explaining *Miller* did not turn on whether "the Second Amendment protects only those serving in the militia," but rather on "the character of the weapon" at issue in that case). *Heller*'s use of the word "law-abiding," therefore, provides no support for the view that felons are unentitled to the Second Amendment's protection.

Mr. Donvan recognizes that, at times, *Bruen* repeats *Heller*'s "law-abiding citizens" formulation. *E.g.*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self- defense needs from exercising their right to keep and bear arms."). But that is because the petitioners alleged, "[a]s set forth in the pleadings below," that they were "law- abiding, adult citizens," and the Court granted certiorari to decide only whether "New York's denial of *petitioners'*

license applications violated the Constitution." *Id.* at 2124-25 (emphasis added). No other questions were before the Court in *Bruen*. *Heller*'s description of the right to bear arms "in the home" does not mean the Second Amendment is inapplicable to other *places*, and the same is true here: *Bruen*'s description of "law-abiding citizens" does not mean the Second Amendment is inapplicable to other *people*.

If *Bruen* excluded the non-law-abiding from the Second Amendment, the opinion would suffer from hopeless internal inconsistency. *Bruen*'s central lesson is that history    is paramount in Second Amendment interpretation—a point the Court made over and over again. *See, e.g.*, *id.* at 2127 ("[*Heller*] demands a test rooted in the Second Amendment's text, as informed by history."); *id.* ("[*Heller*] looked to history because 'it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right.'"(emphasis in original)); *id.* at 2128-29   ("*Heller*'s methodology centered on constitutional text and history."); *id.* at 2129 (describing means-ends balancing as "inconsistent with *Heller*'s historical approach"); *id.*  at 2130 (likening Second Amendment to First because, in both instances, "to carry [its] burden, the government must generally point to *historical* evidence about the reach of the [amendment's] protections" (emphasis in original)); *id.* ("And beyond the freedom of speech, our focus on history also comports with how we assess many other constitutional claims."); *id.* at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id.* at 2135 ("[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation."); *id.* at 2138 ("We conclude that respondents have failed to meet their burden to identify an American tradition justifying

New York's proper- cause requirement. Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional."); *id.* at 2145 ("Thus, all told, in the century leading up to the Second Amendment and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry.").

> **2. The First Circuit's prior rulings do not demonstrate that 18 U.S.C. § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation and thus cannot control this case.**

The First Circuit addressed the constitutionality of § 922(g)(1) in *United States v. Torres-Rosario*, 658 F.3d 110 (1st Cir. 2011). Since *Heller* it has also addressed Second Amendment challenges to 18 U.S.C. § 922(x)(2)(A), which bans juvenile possession of handguns and 18 U.S.C. § 922(g)(9), which prohibits firearm possession by individuals convicted of misdemeanor crimes of domestic violence. *See United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) and *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011). *Torres- Rosario* involved both a facial and as-applied challenge. Regarding the facial challenge, *Torres-Rosario* stated only that "[a]ll of the circuits to face the issue post *Heller* have rejected blanket challenges to felon-in-possession laws." *Id*. at 113. It undertook no analysis of the historical tradition of felon disenfranchisement regulations.  In assessing the as-applied challenge, the First Circuit observed that the Supreme Court may be open  to claims that some felonies do not indicate potential violence and thus cannot be the basis for applying a categorical ban. However, it noted that Torres-Rosario's prior convictions were serious drug offenses and that "drug dealing is notoriously linked to violence." *Id*. at 113. It concluded that "[a]ssuming arguendo that the Supreme Court might find some felonies so tame and technical as to be insufficient to justify the bad, drug dealing is not likely to be among them."  *Id*.

Although *Torres-Rosario* did not cite to either case, the First Circuit did engage in some discussion of the historical tradition of firearm regulation in two prior cases: *Rene E.* (juvenile possession of handguns) and *Booker* (misdemeanants convicted of domestic violence). In *Rene E.* the First Circuit cited thirteen state cases criminalizing the sale to and in some instances the possession of guns by juveniles from 1858 to 1926. *Id.* at 14-15. Acknowledging that these cases only went back as far as the Civil War period, the Court noted that there was "at least some evidence" that the founding generation would have shared this view, and noted that limitations on juvenile possession "were sometimes expressed as efforts to disarm the 'unvirtuous.'" *Id.* at 15 (citing Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)).[7] It then observed that "[i]n a sense, the federal ban on juvenile possession of handguns is part of a longstanding practice of prohibiting certain classes of individuals from possessing firearms – those whose possession poses a particular danger to the public." *Id.* It cited three law review articles to support this view. However, it also observed that "[t]o be sure, there is an ongoing debate among historians about the extent to which the right to bear arms in the founding period turned on concerns about the possessor's 'virtue,' *i.e.* on a legislative judgment that possession of firearms would pose a serious danger to the public." *Id.* at 16 (citing Churchill, *supra* at 13). Nevertheless, it concluded that "even Churchill appears to agree that the right to keep arms in the founding period did not extend to juveniles." *Id.* at 16.

In *Booker*, the First Circuit acknowledged that the language in *Heller* that the "right

---

[7] In *Kanter v. Barr*, then-Judge Barrett noted that "[t]he problem with this argument is that virtue exclusions are associated with civil rights – individual rights that 'require[d] citizens to act in a collective manner for distinctly public purposes.' . . . *Heller*, however, expressly rejects the argument that the Second Amendment protects a purely civil right. *Kanter*, 919 F.3d at 462-463.

secured by the Second Amendment is not unlimited" and that "nothing in our opinion should

be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons

and the mentally ill" were "passages that had been the subject of much debate in the courts

as well as extensive academic commentary, and that "the full significance of these

pronouncements is far from self-evident." 644 F.3d at 23. In general, it noted the "relative

futility of 'pars[ing] these passages of *Heller* as if they contain an answer to the question

whether § 922(g)(9) is valid." *Id.* (citing *Skoien*, 614 F.3d at 640). Nevertheless, it noted

that the passages signaled first that "statutory prohibitions on the possession of

weapons by some persons are proper," and second that "the legislative role did not

end in 1791." *Id.* at 23 (citing *Skoien*, 614 F.3d at 640)).

   The *Booker* court frankly acknowledged that "the modern federal felony firearm

disqualification law . . . is firmly rooted in the twentieth century and likely bears little

resemblance to laws in effect at the time the Second Amendment was ratified." 644 F.3d at

23-24. It acknowledged as well that "the historical pedigree of laws disarming those

convicted of a crime is subject to substantial debate among scholars." *Id.* at 24 (citing five

law review articles). However, it reasoned that "[t]he recency of enactment and the

continuing evolution of this 'presumptively lawful' limit on gun ownership support the

conclusion that, 'although the Justices have not established that any particular statute is

valid . . . exclusions need not mirror limits that were on the books in 1791.'" *Id.* at 24 citing

*Skoin*, 614 F.3d at 651. In addition, it stated forcefully that the age of the regulation could not

be the key to its constitutionality:

> Nor can it be that the relative age of a regulation is the key to its constitutionality.
> As the Seventh Circuit has observed, "[i]t would be weird to say that § 922(g)(9) is
> unconstitutional [at this time] but will become constitutional by 2043, when it will
> be 'longstanding' as § 922(g)(1) was when the Court decided *Heller*.

*Id*. at 24. While the Court noted that it had looked closely at the history of restrictions on gun possession by juveniles in *Rene E*., it disclaimed that "our decision in *Rene. E.* should not be taken to suggest, however, that a law may only be found constitutional reference to its historical provenance." *Id*. at 24. n. 15. The Court went on to hold that the categorical ban on gun ownership by misdemeanants convicted of domestic violence was supported by a "strong showing" necessitating a "substantial relationship between the restriction and an important government objective." *Id*. at 25.

The problem, of course, is that this analysis is directly contrary to the central premise of *Bruen* -- that to determine if a specific firearms regulation is constitutional, the Court must assess whether the government has "affirmatively prov[ed] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at 2127, 2130. Moreover, while *Booker* states that "exclusions need not mirror limits that were on the book in 1791," *Bruen* sets forth strict guidelines for when a court may "reason by analogy" – only when a statute addresses a problem that was "unimaginable at the founding," (*id*. at 2132) and not when a challenged statute "addresses a general societal problem that has persisted since the 18th century (*id*. at 2131). Because of this and because *Booker* heavily relied upon the "presumptively lawful" dicta of *Heller*, the First Circuit's prior analysis cannot control this case.

## CONCLUSION

Section 922(g)(1) is not consistent with the nation's historical tradition of firearm regulation and violates the Second Amendment. The Court should therefore dismiss the indictment.

The government through AUSA Anna Krasinski objects.

A hearing is requested.

November 23, 2022                           Respectfully submitted,
                                           Corey Donovan,
                                            by counsel,


                                           */s/*Donna J. Brown
                                           Donna J. Brown #387
                                           Wadleigh, Starr & Peters
                                           *95* Market St
                                           Manchester, NH 03801
                                           603-669-4140
                                           dbrown@wadleighlaw.com




**CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2022 the above document was served
electronically upon all counsel of record through the CM/ECF filing system.


                                           */s/*Donna J. Brown
                                           Donna J. Brown